Good morning, Your Honor, and may it please the Court, my name is Roy Cattriel. I'm counsel for Appellant Albert Stein in the case of Stein v. Pacific Bell et al. At this point, I'd like to reserve four minutes of my time for rebuttal. Your Honor, in this antitrust class action case and telecommunications class action case, the district court, after finding that Stein's operative second amended class action complaint had properly alleged facts that, if proven, would amount to violations of Section 251 of the Telecommunications Act, nevertheless dismissed Stein's Telecommunications Act claim, holding that the duties allegedly breached by defendants were owed only to its competitors and not to consumers like Stein. We believe that was error. And as to Stein's antitrust claims, two weeks before trial, the district court granted summary judgment, holding that the intervening Supreme Court case of Verizon Communications v. Law Offices of Curtis v. Trinco mandated dismissal. We believe that that was error as well, and I'd like to address those in turn, if I may. With respect to the Telecommunications Act claim, as stated, the district court already found, and it was dismissed on a Rule 12b-6 stage, so that the complaint adequate pleaded violations, at least alleged violations, of Section 251. What were the violations? Well, the violations were the – Specific violations. The violations as pled were that defendants failed to properly allow for proper interconnection because they failed to properly allow for co-location, loop qualification, and other services required for competitors to interconnect. Which provision of – is it 250, 251 or 252 does that relate to? Well, it's – the duties are found under Section 251. Section 252 allows incumbents the option – Let me be more specific. Which provisions in 251 are you alleging were violated here? Section 251a, the proper – that the proper allowing interconnection, which necessarily requires co-location, loop qualification, and the like. 251a. What else? 251b. And what does 251b provide for? Which explicitly requires co-location. And – and Section 251c, which calls for allowance of operation support services. But those are the two – the three violations. And, in fact, yes. But – Are there any others? Well, with respect to the Telecommunications Act, no. There were other violations. I'm talking about the Telecommunications Act. That is correct. Okay. Those are the three. That's right. Okay. Now, what happens with – what's your understanding, then, when the incumbent negotiates a interconnection agreement with, you know, the competitors? Okay. What happens is that – What happens to that obligation? Well, the obligation doesn't go away. Section 252, in fact, which is the statutory provision that allows an incumbent to negotiate an interconnection agreement, makes clear that while you can negotiate different standards, those obligations still remain. The whole purpose of the Telecommunications Act, after all, is to allow. So the – so the incumbent must not only comply with the terms of the interconnection agreement, but also must satisfy the statutory obligations. Well, I guess the way I would phrase it, Your Honor, is that an agreement under Section 252 cannot run counter to the obligations of Section 251. Certainly different standards. What do you do with it without regard to language? Well, without regard to the standards, it merely means that the Federal Communications Commission can announce and has announced rules providing for the mechanism of collocation, the mechanism of allowing loop qualification, the mechanism of allowing interconnection. So they can't negotiate an interconnection agreement that anywhere differs from the standards under 251? They can't – they can't negotiate an agreement that is – that renders those obligations nugatory. Certainly they can – they can negotiate an agreement that has different standards in place. For instance, we will deliver a collocation cage to you in 150 days, even though the FCC only requires it in 120 days. But you can't impose a contract that says we will never provide to you collocation if you pay us $1,000. Right? They couldn't do that. That's the claim here, though, with collocation, for example. The collocation here, and we've produced evidence in the record from their own declarant, that for several months during the class period, the defendants failed to supply even one requested collocation arrangement on time per the terms of that agreement. But I'd like to – I'd like to – That's not a violation. Then you're not alleging a violation of the statute. Well, actually, we are, because – How? Because under the defendant's reading, once specific bill signs on the dotted line on an agreement, they would have you believe that the statute is totally indifferent as to whether Pacific Bell ever complies with that agreement. That is, that the Telecommunications Act, Congress simply does not care. Once you sign on the dotted line saying I provide – I will provide to you collocation under my agreement, if Pacific Bell never intends to honor that and never honors that, the Telecommunications Act could care less. In our view, that's simply not a proper reading of the statute. The proper reading of the statute is that you enter into a collocation – into an interconnection agreement. Certainly, you have that option. But nowhere does the Telecommunications Act allow you to then violate with impunity that very interconnection agreement. What's important here is even – Is it up to the other party, the competing – the SELEC to assert a breach of the agreement in either some sort of regulatory action or a plain old garden variety breach of contract case? Absolutely, if you were dealing with a breach of contract claim. Certainly, only the parties to the agreement, absent a third-party beneficiary standing, would have right to assert a breach of contract case. But our point here, which the district court, we maintain, missed, was that Section 206 and 207 of the Act allow for a private right of action and allow it to consumers as well as to competitors to assert a violation of the Act. But a private right of action for a violation of every single provision in the Act? Well, every single provision within that chapter. That's right. Within that chapter, which is Chapter 2, which is where Section 251 is found. Now, my point here – But for some reason, the competing – the competitor doesn't want to bring that action. Consumers can bring it as sort of a private attorney general. No, it's not a private attorney general because you still have to show that you were injured. And our position here is that the injury to the competitor and the injury to the consumer are distinct. The competitor, when it doesn't receive what it bargained for, may lose profits and sales. But the consumer is not allowed to avail himself of competition that would have presumably taken place if the interconnection was complied with. The same thing happens in an antitrust context. Any antitrust case always claims that the monopolist destroyed competitors in competition. But the consumer, nevertheless, is also allowed to sue because while the competitors lost sales, the consumer overpaid. And that's the situation that we have here. Before you jump to the antitrust, I just want to make sure I understand your – how you're reading the relationship between the interconnection agreement and the duties under 251. I guess you're saying that even though there's a contractual agreement, the duties under 251 still survive vis-a-vis a consumer. Yes. And I guess I would refine that. Is that the way you would like me to look at that? Well, that's – If not, I want you to explain to me, because I think this is important, because you've got to give some meaning to the interconnection agreement. That's right. And what I'm saying is that what Section 251 provides, in the context where you have a Section 252 agreement, Section 251 says if you have an agreement, you can't violate  Yes. In the absence of Section 206 and 207, the competitor would always have a breach of contract cause of action. We're not disputing that. But the mere fact that now a competitor has a breach of contract cause of action does not negate the fact that any other party that is also injured, i.e., consumers, also has a cause of action explicitly under Section 206 and 207. So are they suing as sort of third-party beneficiaries of the agreement? No, because they're not relying on the contract to assert a cause of action. Section 207 says – Section 206 says that anybody harmed by any violation – excuse me, that ILECs are liable for any violation. And Section 207 says who can then sue? Section 207 says any party injured can sue. I find that a little hard to follow, because if 251 says these are interconnection agreements, and here's what has to be included in them, and the ILEC and the CILECs enter into an interconnection agreement, then you're – you're saying that there is a right of action to sue for breach of the provision, even though it's contained in the interconnection agreement, which is what the statute requires. Well, the recourse of the competitor is to sue under a breach of contract and also under Section 206 and 207. The consumer doesn't have the contract because it's not a party to it. But what we're saying is that Section 251 was not a blind mandate by Congress to the ILECs to say, once you sign on the dotted line, you're free to violate it and you're immunized from suit from competitors. Could the competitor sue under – bring a statutory claim if they're – Our position is – If there's a breach of the – if they claim a breach of the interconnection agreement? Yes. In fact – in fact, the contract – unless there's a – unless the contract explicitly forbids it. For instance, the contract that they privately negotiate with Pacific Bell may say, in lieu of suing under 206 or 207, we agree to submit to arbitration. That doesn't bind consumers. You can't be bound to arbitrate when you haven't signed an arbitration agreement. And our point is simply the mere fact that there's a private contract between Pacific Bell and a competitor, does that take away a right of a consumer under Section 207? I'm trying to understand how the – how the incumbent evaluates its duty if there's – if the incumbent has signed a interconnection agreement. Well, its duty is to fulfill the terms of that contract. And my point is – But how does it – how does it also meet the statutory obligation as well? Because what you're saying is there's not only the obligation under the interconnection agreement, but there's also the statutory obligation that they still must nevertheless satisfy vis-à-vis the consumer. Well, I believe what I said was that the – they have to satisfy the agreement and that the agreement can't render the core obligations under Section 251 nugatory. That's what I meant to say. Now, clearly under the merits of our case on the TELCO Act claim, we would have to show that they in fact violated the agreements, that they entered into agreements and that they violated. So we would look to the contract for the merits of the claim. That is, was there a violation? The question is what gets us into court in the first place? And that's Section 207, which gives us that private right of action. Now, the question is how do we know that that's the case other than by simply reciting Section 207? Well, we know that because if we look three sections down from Section 252, Section 255, Congress also mandated obligations on ILICs. It said that you have to make your services available to people with disabilities and mandate a very specific way in which you had to do it. But that same section, Section 255, says that nothing here shall amount to a private right of action for people to enforce this violations of this section, which means that when Congress wanted to exclude certain sections within that chapter from the ambit of Section 207, it knew how to do so and did so explicitly. It didn't do that in Section 251 and 252. It didn't say that once an interconnection agreement is signed, no, Section 207 may not be used. Any person otherwise having a private right of action under Section 207 now no longer has that right. It did that in Section 255. It didn't do that in Section 251 or 252. The mere fact that Pacific Bell chose to agree privately with AT&T or with Sprint or with whomever that there would be an alternative dispute resolution mechanism as to those two parties cannot be read to mean that other parties that are injured and that never signed on to that agreement are stripped of their private right of action under Section 207. Why doesn't Trinco do away with your antitrust claim? Well, Trinco doesn't do away with our antitrust claim because Trinco addressed the question as to whether an alleged monopolist carrier that engaged in dealings with its competitors solely as a result of mandates imposed on it by the 1996 Telecommunications Act can be held to be liable under the antitrust laws for breach of those duties. What we have here, however, and what we introduced before the district court, is that entered into voluntary negotiations with competitors and with the FCC in the hopes of obtaining approval for its desired merger with Ameritech. And as part of those negotiations, it agreed to provide co-location independently of the 1996 Act. It agreed to provide loop provisioning and loop qualification information. And our position is those are now voluntary agreements. We know they are voluntary because Pacific Bell said as much at the time. This was before Trinco was decided. Excuse me. It said, for instance, that SBC is a merger that these merger conditions do not supplant the obligations under Sections 251 and 252. Rather, SBC and Ameritech is voluntarily offering to negotiate with any interested CLEC amendments to an interconnection agreement and so forth. It said, for instance, that we explained, this is SBC's counsel talking, that the carrier-to-carrier motions proposed by SBC are voluntary, and also that, quote, as a result of recent discussions with the FCC, Common Carrier Bureau, merger review staff, SBC and Ameritech are expected to propose the following voluntary conditions. Those are all voluntary conditions. That is, SBC made a business calculus that the merger that it sought with Ameritech was financially more important to it than what it would have to give up by obligating itself to voluntarily provide these services. Just give up more in the merger context or under the merger agreement than it would have had to, I don't know, I don't want to use the term give up, but negotiate under its obligations under the Telecommunication Act if Sprint had demanded services. Well, certainly as to loop qualification, we maintain that it did because it required them to give real-time loop qualification information, which at that time the 96 Act did not require. But with respect to Your Honor's question, the bigger issue is, let's say that it did negotiate these merger conditions voluntarily to sort of entice the FCC and competitors to side with it. So we have that. And let's say that it later breached these. Let's assume we never had the 96 Act. I think it's fairly clear that if you make a bargain with the government under which you'd say, if I follow these conditions, you'll agree with me that we're competitive and that there's no monopolization, and then you breach those, that there is a cause of action, at least alleged, for monopolization. Now we have the 96 Act, and we superimpose that. The question is, what's the effect of that? Well, the effect of that is that what they're saying is, well, because these obligations or voluntary commitments are also obligations under the 96 Act, then the mere fact that we violated them cannot make us liable under the antitrust laws. In effect, we're immune from antitrust liability for violating any of these commitments because they're also found under the 96 Act. Mr. Stein, I would have been with you when I was on the Metronet panel the first time around. I thought these arguments made imminent good sense, and so I voted to overturn the summary judgment that the district court had entered denying antitrust liability on the part of the SELACs. And the Supreme Court vacated Metronet after Trinco came down and sent it back to us, and we issued a published opinion that goes the other way. Why aren't you bound by our decisions in both the Supreme Court in Trinco and this Court's decision in Metronet? If SELACs don't have an antitrust claim, then why do consumers? No, I'm not under the facts of this case. The facts of this case certainly differ from Trinco because Trinco's analysis began and ended with the 96 Act obligations. Here what we're saying is that those obligations also arose independently under the voluntary merger concessions that the Pacific Bell made, which are themselves characterized by them as voluntary. What I was trying to respond to in explaining as to the question raised by Judge Pai says, so what happens now that we do have the 96 Act, what's the effect? What they're saying is even if we violated our voluntary merger conditions, it doesn't matter because those are obligations that we have anyway under the 96 Act, and so we can't be found liable. Well, that's an immunity argument. That's saying that so long as the voluntary obligations that we undertook and breached, allegedly, are also found in the 96 Act, then we can't be held liable under the antitrust laws. But Trinco held the exact opposite. It held that there was an antitrust savings clause in the Telco Act itself, Section 601B. You know, nothing found here in shall modify, superimpose, or impede antitrust liability in so many words. The fact of the matter is that if they would have been held liable under the antitrust laws for violating their voluntary merger conditions that they proposed before the 96 Act, then the mere fact that the 96 Act exists cannot give them immunity shelter and say, well, you would have been held liable under the antitrust laws before. There's a question there's a savings clause. But how do you know you have to read Trinco along with Aspen-Skene as well? That's right. And in Trinco, doesn't the Court say that, you know, Aspen-Skene takes refusal to deal situation to the extreme and outer limits? Well, certainly it said that it was at the outer boundary. And it referenced Aspen-Skene for the point that there there was a voluntary, preexisting voluntary course of conduct that was later changed. That's exactly what we're making here. I mean, the term voluntary was not one that we plucked. It's how they describe their concessions. We are voluntarily, in order to entice you, the FCC. But you said you have to superimpose the 96 Act. Well, we have to look at the effect that the superimposition of the 96 Act has on that. My point is that Trinco supplies the answer to that because it says the mere fact that those duties are also encompassed within the 96 Act doesn't immunize you from antitrust liability if you would have been liable prior to the 96 Act. The 96 Act is not an immunity-granting provision. And that's the thrust of our point. Counsel, you're down to a minute. I'll reserve. Thank you, Your Honor. We'll give you a couple of minutes. I appreciate it. Good morning, Your Honors. May it please the Court. Craig Stewart for the appellees. I intend to address first the Telecommunications Act standing question and then the antitrust issue. On the Telecommunications Act cause of action, there really are two points, the first of which is that the Second Circuit's decision in the Trinco case, which was not at issue when the Supreme Court took the case, is squarely on point here. The Court there held that consumers do not have a cause of action to enforce the duties owed under Section 251 because those are not freestanding duties. They are triggered only by a request from a competing carrier and are subject to negotiation between the two carriers, resulting in an interconnection agreement that is then approved by the State regulators. And once that interconnection agreement is enforced, then the carrier's duties, the ILEC's duties to the CILECs are defined by that agreement. It's interesting this morning that counsel essentially conceded that his position is, barring an arbitration clause that might keep it out of court, that a competitor the logic of his argument is that a competitor could bring a suit under Section 207 to enforce statutory duties without regard to the contract that they're governed by. And his position, I guess, is that that makes sense because the interconnection agreement is, cannot be contrary to or any different from the statutory requirements. But that's simply not the law. Section 252 makes clear that when the arbitration, when the negotiated interconnection agreement is presented to the State commission for approval, if it's been a voluntarily negotiated agreement, voluntary in the sense that they reached agreement without having to go to arbitration, it's still compelled by the statute in Section 251C1, that the State commission may reject it only if it discriminates against other carriers or if it's not consistent with the public interest. It doesn't require that the interconnection agreement that's negotiated conform exactly to the various, the minutia of regulation that the FCC may impose in the absence of such a negotiated agreement. So the Second Circuit had it exactly right when it held that the duties that are at issue here are imposed by interconnection agreements. That is the vehicle by which the Telecommunications Act seeks to accomplish its, seeks to adopt. So I guess your position is that a consumer could never bring a 251 claim? I think that's right, Your Honor. Even if there were no interconnection agreement? If there were no interconnection agreement, and it's hard for me to imagine how that could happen, because that is the way these get implemented. That is the structure of the statute. But if there were no interconnection agreement, then the analysis would have to be a little different. It would be sort of our second point, which is that just under the principles that have developed over the years in construing rights of action under statutory provisions, Section 207 must be construed in light of those limitations. And those limitations include the remoteness of the injury, the derivative nature of the injury, the nature of the statutory rights that are at issue, whether there is a group of parties who are situated and motivated to bring claims for all of those reasons, which we elaborate in our brief, and which are similar to the reasons that are, the Supreme Court has adopted in construing the similar provision of the antitrust laws and the standing provisions there. For all of those reasons, the consumer would not have standing, even in the absence of an interconnection agreement. Well, you know, 207 and 206 are fairly broad. They are. They are. And the antitrust right of action provision, Section 4 of the Clayton Act, is equally broad. And the RICO right of action is equally broad. And the telecommunications, Section 206 and 207, those sections were adopted from the Interstate Commerce Act, which had regulated telephone companies before the Communications Act was enacted in 1934. And it was in 1918 that the Supreme Court construed the provisions of the Interstate Commerce Act that later found their way into the Communications Act as embodying or incorporating these common law limitations on who may bring suit. And the Supreme Court has made it clear in construing all of these broad right of action provisions that a mere allegation, which is what the plaintiff's position here is, a mere allegation of some injury is not enough to confer upon a person a right of action to enforce this language. We still have to go through the analysis. But what happens in the situation then where there is no voluntary interconnection agreement, but it's superimposed by the Public Utilities Commission, for example? Even in that circumstance. What happens in that situation? Even in that circumstance. Well, in that circumstance, we're back within the Second Circuit's reasoning in Trinco that you have an interconnection agreement that then defines the duties that the carrier, that the ILEC must comply with. And again, I think it's important to emphasize that the logic of their position is that even the competitors could bring a lawsuit under Section 207 and 251 to enforce these duties, notwithstanding that they have an interconnection agreement that defines it. And let me emphasize at this point that Section 251 is very broadly stated, and the violations that are being alleged by the plaintiffs are with very specific alleged duties that you don't find in the broadly worded language of the statute. Those duties are implemented by the interconnection agreements that may be negotiated or arbitrated or imposed by a commission in light of the FCC's regulations. But it's they're implemented in that agreement, and the agreements have to fill in the gaps and fill in the details that you just don't find in the broad language of the statute without regard to interconnection agreements. And I think it's telling. I still don't understand the basic point you have. Do you disagree that 206 and 207 give a private right of action to consumers? We disagree that they give a private right of action to consumers. They provide a right of action. The question is, who is the proper party to invoke that right of action? And you don't think our case is established that there is a private right of action to consumers? Not in favor of consumers, no, Your Honor. And, again, as for two reasons. One is the analysis that the Second Circuit followed in the Trinko case, which is, again, I think exactly on point here. And then the second reason, which the Second Circuit did not reach, the plaintiffs in their brief argued the Second Circuit rejected what the district court said about 206 and 207. In fact, the Second Circuit twice made clear it was not reaching that. It said even if Section 206 and 207 would reach this, we find no consumer standing. So that's the first reason, is Trinko's Second Circuit decision. The second is that, as I've been explaining, Section 206 and 207 are subject to the longstanding principles that the courts have recognized in construing all of these rights of action with regard to enforcing third-party rights. It's significant here that the none of these obligations exist in the absence of a request from a competing carrier. It shouldn't be surprising that consumers are not part of this enforcement scheme because consumers have no right to trigger these duties in the first place. Absent a request from a competing carrier to provide the services that are at issue here, the co-location and the provision of loops and loop qualification information, absent a request from a competitor, those duties aren't owed. They're only triggered by requests from competitors. And it makes sense then, and those, then they become embodied in an interconnection agreement. And it makes sense that those duties then would be enforced under the interconnection agreement by the competitor and not apart from that in some suit in Federal court. Now, the, the, another reason why all of this makes sense, Your Honors, is that the Telecommunications Act is really an extraordinary statute.  brand-new that had never existed before. And that is these exceptional duties to share, the phone companies to share their facilities with competitors. And it's a very careful balancing act. And the SEC has issued reams of orders and regulations spelling all of these things out. And over time, in the ten years since the act was enacted, they have issued a standard and then retracted it. They have imposed line-sharing duties and then concluded that they're not owed. They have required that DSL providers, I like DSL providers, sell to independent ISPs. And then last year they retracted that duty. This is a subject of a great deal of regulatory scrutiny as to exactly striking the right balance between bringing new competition to the market, but not chilling innovation and investment by those who are already in the market. And this overlaying a whole regime of consumer litigation on top of the competitor's enforcement of the interconnection agreements and the FCC and the state regulatory agency's enforcement of those same obligations would be contrary to and disrupt the statutory scheme. Let me just briefly comment on Section 255. Wait a minute. Does the consumer ever have any mechanism to redress any alleged harm that's occurring between an incumbent and a competitor? The two enforcement mechanisms that we believe exist are the competitor's lawsuits and the regulatory enforcement action. The regulators would act as on behalf of consumers. I must confess I don't know whether there's a, you know, a statutorily prescribed vehicle by which a consumer can register a complaint and try to prompt the regulatory agency to take action, but it is clear that the regulatory agencies do take action. I mean, that's what happened in Trenco. The Trenco lawsuit was filed by a consumer after the New York State Public Service Commission and the FCC had taken regulatory enforcement action against, it was then Bell Atlantic, for not filling orders quickly enough. And it was a follow-on sort of consumer action that the Second Circuit held was inappropriate. So there are the – I think it's very clear that these issues aren't going to go unredressed. The competitors who – Well, but 206 does give a private right of action to somebody, even aside from whatever the regulatory agency can do. Now, it's your position that some people can sue under 206 in a private right of action, but not consumers. When we're speaking of the duties owed under 251, which are only triggered by a competing carrier's request, yes, Your Honor, that is correct. And let me emphasize two points. One is that Sections 206 and 207 long predated Section 251. Those were part of the original Communications Act. 251 came, you know, 60 years later. And let me do come to the Section 255 issue that counsel has raised, because I think it illustrates the point. Section 255 imposes a duty on carriers to ensure that their equipment is designed, developed, and fabricated to be accessible to and usable by individuals with disabilities. That – there's no interconnection agreement overlay there. There's nothing there that requires that that be triggered by a request from a competing carrier. That duty is one that is a freestanding duty in the language of the Second Circuit, owed to individuals. So that is the kind of duty for which 206 and 207 could provide a right of action. And that is why Congress added in Section 255 something to negate that right of action, because the nature of the duty is such that it would otherwise allow consumers to sue. We just don't. Kennedy. They're alleging that there's a violation of various provisions of 251. And 206 says anybody injured by that has a right to file a private cause of action. That seems like a fairly simple proposition. But your answer to it is they're not injured by a violation of 251 because there's a contract? That's part of the answer that the Second Circuit gave. The other part of the answer is, even without regard to what the Second Circuit said, the Supreme Court, in construing these kinds of rights of action, has made clear that the mere – even with that kind of language, any person injured may sue, the Supreme Court has made clear that not every claim of injury gives right to a cause of action. That was its holding in the Associated General Contractors case, where the Court said, however, the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry. And the Clayton Act, Section 4 of the Clayton Act, has just almost exactly the same language. Any person injured may sue. Well, part of what bothers me is that the district court decided this case just on the basis of the act. It didn't – and nobody really got into the question of what kind of a violation is this. Do they make out a proper violation? Is there a cause of action for this particular type of action? It was just a general ruling that there's no standing whatever. And the district court never did consider whether the specific acts alleged are the type of acts for which recovery is permitted. I mean, some recovery is permitted under a section that says everybody injured has a right to sue. And you're saying some men get – are not recovered, and part of what you say is once it gets covered by a contract, the customer doesn't have a right to sue, because then he's suing for a breach of contract. But the district court never got to any of those issues, never said whether any of these were or were not actual violations under 251. This case proceeded up here on the assumption that there was a violation of 251. Well, just as the Second Circuit did in the Trinko case, what the district court did is it looked at the structure of the statute. And it said that these duties, we can assume they were violated. Of course, we dispute they were, but we'll assume that they're violated. The duties that are being alleged here, whether it's to provide co-location on particular time frames, you know, in particular offices, or whether it's to provide loops on a particular time frame, those are duties that are implemented under the statute unavoidably through an interconnection agreement. I mean, that's the way the statute works. If you read Section 251c3, it says the obligation is to provide unbundled network elements, which is what we're talking about here, in accordance with the terms of an interconnection agreement. I mean, that's how the statute is implemented. And so just by their very nature, these allegations are allegations of a — that fall within the holding of Trinko and fall within our argument here. I see I just have three minutes left. I'd like to briefly address the antitrust issue, because I think that's all that it takes. And there's really two points on the antitrust point. The first is, in Aspen Skiing, we had a course of dealing that had originated between the ski company and Highland Ski Company completely apart from any regulatory scheme, any regulatory compulsion. It was a wholly uncoerced course of dealing. And the Supreme Court, in Aspen Skiing, in finding that that could support antitrust liability, the termination of that course of dealing, held that, emphasized that the — that the — there had been a course of dealing that originated in a competitive market and had persisted for years. And then the ski company terminated that and refused to sell even at full retail to the Highland Ski Company. And in Trinko, the Court emphasized the limited nature of that holding. And as Justice Paez mentioned, it is at the extreme of Section 2 liability. And the — and it emphasized two points. One, there had been a cooperative venture, as Trinko called it. Here, there is no cooperative venture. There is only providing loop qualification information to competitors as required by the statute. And the other part is that the Supreme Court said that Trinko differed in a more fundamental way from Aspen Skiing because Verizon was not in the business of providing unbundled network elements to its competitors. In other words, it wasn't selling like the ski company was selling lift tickets. It was not doing that. And that same fundamental distinction exists here. Pacific Bell is not in the business of providing loop qualification information or loops or co-location to its competitors. So there is no discrimination between a company saying, well, we'll deal with everybody, but not you because you're our competitor. That is point number one. We're not in that business. Point number two is, counsel says, well, this was voluntary and notes that in the negotiations with the FCC over the approval of the transfer of the licenses, we referred to the concessions that we were offering as voluntary. That is not the kind of voluntariness that either Trinko or Aspen Skiing was talking about. What happened here is that the FCC basically gave itself additional enforcement tools to enforce the duties that were already owed under the statute. And our capitulation, our acquiescence to the FCC's demand for those kind of concessions and they were concessions, this is not a profit-making venture to sell loop qualification information to competitors. We're not in that business. Those kind of concessions is not the kind of uncoerced course of dealing, the termination of which you can deem to be exclusionary. In Aspen Skiing, the Court emphasized that when you have a voluntary uncoerced course of dealing, that can be presumed to be efficient and an optimal distribution pattern in the eyes of the defendant itself. We have nothing like that here, Your Honor, and for that reason and the other reasons we've explained in our brief, we believe that the antitrust claim was properly dismissed on summary judgment. Thank you. Thank you. Mr. Stewart. Briefly, on the Telco Act claims and the standing requirements, because after all, that's what we're talking about here. It's standing. It's the merits. Is this person a proper plaintiff? Mr. Stewart referred to the fact that even though Section 207 is expansive, the any person language, courts have construed and imposed limitations on it, and he cites cases on antitrust standing. But the point that he neglects to mention is that each and every one of those cases, starting with Ryder v. Sonotone and associated data general, have found that the any person language, if it encompasses anybody, it's a direct consumer to sue. No case construing that language has found that a direct consumer who claims to have been aggrieved is too remote so as not to be encompassed within that language, and that's all we're saying. We also clearly pleaded that the consumers were injured and explained how at paragraphs 81 and 82 of our second amended complaint. So I think, and as Judge Reinhart pointed out, the district court's own opinion found that the allegations, if proven, amounted to violations of Section 251. But she just assumed. No. No. I think that the actual language is that the allegations, if proven, amount clearly state violations of Section 251. She didn't pass on the truth of those allegations. Obviously, she couldn't. It was a complaint. But let me also address, going back to the interplay between the interconnection agreement and Section 251, yes, it's true that Section 251 requires carriers upon being demanded to do so to enter into a contract. The question is whether the Telco Act requires the carrier to also honor that contract. And the answer is, of course it does. It would be an empty statute if it said you have to sign the contract, but then you're free to violate it. The statute is silent as to whether you need to honor it. But what Mr. Stewart says the answer to that is it can be enforced either by the competitors who are parties to the agreement or by the State regulatory commissions in their regulatory process. Why isn't that sufficient? Because Mr. Stewart would have us read out Section 207 that Congress put in. That would certainly be the default if Sections 206 and 207 did not exist. But Sections 206 and 207 do exist. And he's quite correct. Isn't his position that 206 and 207 is the authorization to the competitors to bring the action for the breach? Oh, absolutely. Absolutely not. The language says any person, which as we've said, cases I've interpreted to mean consumers. But more than that. But you agree that also includes competitors. Oh, sure. We're not saying that competitors are excluded. But more than that, there is plenty of case law of consumers bringing suit under Section 207. We cited the Valdez case versus Quest Communications. I mean, consumers avail themselves of Section 207 to bring cases under the Telecommunications Act all the time. They're simply saying treat Section 251 differently. And what we say is that when Congress wished to treat a particular section differently and knew how to do so, as is evidenced by Section 255. Thank you. Thank you, counsel. Thank you both very much. The case to be adjourned will be submitted.
judges: Reinhardt, Paez, Tallman